IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 24, 2009 Session

## STATE OF TENNESSEE v. LISA RENEA SMITH

**Direct Appeal from the Criminal Court for Knox County**
**No. 87465     Richard R. Baumgartner, Judge**

---

**No. E2009-00202-CCA-R3-CD - Filed December 17, 2010**

---

Appellant, Lisa Renea Smith, was engaged in a custody dispute over her daughter but allowed to visit her pursuant to a Knox County Juvenile Court order.  After one such visit, she refused to return her child and instead took her to Atlanta.  The juvenile court held a hearing and found Appellant in contempt for violating the visitation order.  Appellant was later indicted in the instant case for violating the custodial interference statute, Tennessee Code Annotated section 39-13-306.  After an unsuccessful motion to dismiss based on double jeopardy protections, she pled guilty to a Class A misdemeanor but preserved the double jeopardy issue for appeal.  Upon review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Philip Lomonaco and Bradley L. Henry, Knoxville, Tennessee, for the appellant, Lisa Renea Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Zane Scarlett, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

Appellant and Rodney Ash had a custody dispute over their minor child.  The Juvenile Court for Knox County issued an order on August 24, 2006, granting Appellant visitation.

The order provided that Appellant "shall not remove the child from the jurisdiction during her visits."

After a visit just days later, Appellant absconded with the child to Atlanta, Georgia. The juvenile court held a contempt hearing, at which Appellant testified to the pertinent facts. The court found Appellant in contempt for violating the visitation order and sentenced her to ten days in the Knox County Jail.

About a year later, Appellant was indicted by a Knox County Grand Jury on three counts of violating Tennessee's custodial interference statute, Tennessee Code Annotated section 39-13-306. The indictment was based upon the same conduct that led to the juvenile court contempt order.

Appellant moved to dismiss the indictment, arguing that because she had already been held in contempt for the same conduct, the double jeopardy clauses of the United States and Tennessee constitutions barred further prosecution. After a hearing, the trial court denied the motion based on our supreme court's decision in State v. Winningham, 958 S.W.2d 740 (Tenn. 1997). The trial court noted that the "jurisdiction" referred to in the custody order was Knox County; whereas the custodial interference statute was triggered by removal from the state. It also reasoned that contempt and criminal prosecution are two different remedies that can be pursued simultaneously. Thus, it concluded, the custodial interference prosecution was not barred by double jeopardy principles.

Appellant subsequently entered into a plea agreement whereby she pled guilty to one count of misdemeanor custodial interference but preserved the double jeopardy issue for appeal pursuant to Tennessee Rule of Criminal Procedure 37.[1] Appellant was sentenced to three days in custody and released for time served. The judgment articulated the certified question as follows:

> [Appellant] entered a plea reserving an issue for appeal pursuant to [Rule 37]. The certified question is whether [Appellant's] motion to dismiss based on double jeopardy grounds should have been granted. Prior to [Appellant] being charged with custodial interference, she was ordered by juvenile court to not

---

[1] Under the agreement, the remaining two counts of the indictment were dismissed by the State. The written plea agreement provides that Appellant would plead guilty to Count I and that Counts II and III would be dismissed. But the trial court entered judgment against Appellant on Count III, not Count I. Yet there is no dispute between the parties regarding the factual basis for the juvenile court's contempt order or the present conviction for custodial interference. Further, the factual basis for each custodial interference charge appears to be the same and identical to the factual basis for the contempt order.

remove her child from the local jurisdiction. [Appellant] removed her child and was punished by juvenile court for contempt and was sentenced to 10 days in the Knox County Jail on the contempt charge. Thereafter, [Appellant] was charged with custodial interference for the same removal of her child that she was punished for in juvenile court. [Appellant] argues that the subsequent prosecution in Knox County Criminal Court is barred on double jeopardy grounds as she was punished twice for the same act. The certified question is expressly reserved as part of the plea agreement with the State and the trial court consenting to the reservation. [Appellant], the State prosecution and the trial court are all of the opinion that the certified question is dispositive of the case.

## II. Analysis

Our review of the trial court's denial of the motion to dismiss presents a question of law, which we review de novo with no presumption of correctness. See Winningham, 958 S.W.2d at 742-43 (citing State v. Davis, 940 S.W.2d 558, 561 (Tenn. 1997)).

At the outset, it is necessary to review the relevant forms of contempt under Tennessee law. Generally, there are two types of contempt: civil and criminal. "Civil contempt occurs when a person refuses or fails to comply with a court order and a contempt action is brought to enforce private rights." Black v. Blount, 938 S.W.2d 394, 398 (Tenn. 1996). A civil contempt order is "designed to compel the contemnor to comply with the court's order." Id. It is thus "available only when the individual has the ability to comply with the order at the time of the contempt hearing." Ahern v. Ahern, 15 S.W.3d 73, 79 (Tenn. 2000). However, a civil contempt order may also be designed to "compensate the injured party." Overnite Transp. Co. v. Teamsters Local Union No. 480, 172 S.W.3d 507, 511 (Tenn. 2005); see also Tenn. Code Ann. § 29-9-105.

"Criminal contempts, on the other hand, are intended to preserve the power and vindicate the dignity and authority of the law, and the court as an organ of society." Black, 938 S.W.2d at 398. Unlike in the civil context, "[a] party who is in criminal contempt cannot be freed by eventual compliance" because the order is designed "simply as punishment for the contempt." Ahern, 15 S.W.3d at 79. Criminal contempt is, therefore, "both punitive and unconditional," Black, 938 S.W.2d at 398, and "is generally regarded as a crime," id. at 402 (citing Bloom v. Illinois, 391 U.S. 194, 201 (1968)).

Contempt proceedings are further divided between those that are "direct" and those that are "indirect." Id. at 398. "Direct contempt is based upon acts committed in the presence of the court," whereas indirect contempt concerns actions taken outside the court's

presence.  Id.  The minimum procedures necessary to satisfy due process varies depending upon whether the proceeding involves direct or indirect contempt.  See id.; State v. Turner, 914 S.W.2d 951, 955 (Tenn. Crim. App. 1995).  For instance, direct criminal contempt may be acted upon summarily, but indirect contempt requires a hearing.  See Black, 938 S.W.2d at 398 (citing State v. Maddux, 571 S.W.2d 819, 821 (Tenn. 1978)); Tenn. R. Crim. P. 42.

To be sure, the contempt order at issue in this case was the result of a nonsummary indirect criminal proceeding.  Appellant's contemptuous conduct—absconding with her child to Atlanta after an authorized visit—took place outside of the court's presence and thus required the court to take evidence in order to evaluate the allegation.  Therefore, the question is whether the double jeopardy protections barred Appellant's subsequent prosecution for custodial interference after her conviction for nonsummary indirect criminal contempt for the same conduct.

The double jeopardy clauses of the Fifth Amendment to the United States Constitution and Article I, section 10 of the Tennessee Constitution protect an accused from multiple punishments for the same offense.  See State v. Pickett, 211 S.W.3d 696, 705 (Tenn. 2007); State v. Denton, 938 S.W.2d 373, 378 (Tenn.1996).  These protections attach to at least some of the contempt proceedings described above.  The United States Supreme Court has plainly held that the federal protection attaches to a nonsummary criminal contempt proceeding.  See U.S. v. Dixon, 509 U.S. 688, 696 (1993); see also Winningham, 958 S.W.2d at 743 n.4 (discussing Dixon).  Dixon explained that, given the variety of procedural protections afforded defendants in nonsummary criminal contempt proceedings, it was "obvious . . . that the protection of the Double Jeopardy Clause likewise attaches." 509 U.S. at 696.  Tennessee cases also clearly demonstrate that the double jeopardy protections apply to nonsummary indirect criminal contempt proceedings.  See, e.g., Ahern, 15 S.W.3d at 82; Winningham, 958 S.W.2d at 747.[2]  Indeed, in both Ahern and Winningham, our supreme court conducted a full double jeopardy analysis of the second prosecution.  See Ahern, 15 S.W.3d at 78-82;

---

[2]  Notably, the procedural protections Tennessee law affords defendants in such cases closely resemble those afforded federal defendants.  In the federal context, a nonsummary criminal contempt defendant is entitled to the presumption of innocence, proof beyond a reasonable doubt, protection from self-incrimination, notice, assistance of counsel, the right to be heard, and a public trial.  See Dixon, 509 U.S. at 696 (citing cases).  A nonsummary indirect criminal contempt defendant in Tennessee is afforded similar protections.  See Black, 938 S.W.2d at 398 (requiring "notice and an opportunity to respond to the charges at a hearing" as well as proof of guilt "beyond a reasonable doubt"); see also Tenn. R. Crim. P. 42(b).  The similarity between the two sets of procedural protections supports our conclusion that the double jeopardy protections attach to a nonsummary indirect criminal contempt proceeding in Tennessee.

Winningham, 958 S.W.2d at 742-47.[3]  Moreover, because Appellant testified and admitted to the essential facts, the protections attached at that moment, if not sooner.  See Ahern, 15 S.W.3d at 80 ("In non-jury proceedings, jeopardy attaches when the first witness testifies.").

Although both the United States and Tennessee constitutions protect an accused from multiple punishments for the same offense, they differ in how they determine whether the double jeopardy protections are triggered.  See Winningham, 958 S.W.2d at 743.  Under the federal constitution, double jeopardy is governed by the Blockburger, or "same-elements," test.  See Dixon, 509 U.S. at 696 (citing Blockburger v. United States, 284 U.S. 299 (1932)).  Under the Tennessee Constitution, the Blockburger test is the first of four considerations that courts weigh to determine whether the double jeopardy protection applies.  See Winningham, 958 S.W.2d at 743 (quoting State v. Denton, 938 S.W.2d 373, 381 (Tenn. 1996)).  Once Blockburger is satisfied, a court applying Tennessee's double jeopardy protection must then (1) conduct an analysis of the evidence used to prove the offenses, guided by the principles of Duchac v. State, 505 S.W.2d 237 (Tenn. 1973); (2) consider whether there were multiple victims or discrete acts; and (3) compare the purposes of the respective statutes.  See Winningham, 958 S.W.2d at 743; Denton, 938 S.W.2d at 381.  None of these steps is determinative with respect to the state protections; the results of each must be weighed and considered in relation to each other.  Id.  However, if "the offenses are the 'same' under Blockburger, the federal constitutional double jeopardy protections have been violated and the inquiry may end."  State v. Hayes, 7 S.W.3d 52, 55 (Tenn. Crim. App. 1999).

## A.  Blockburger/Fifth Amendment Analysis

---

[3]  Winningham cites three Tennessee cases that could be read to suggest that because of the different interests served by the contempt and substantive criminal statutes, and the legislative intent behind the general contempt statute, the double jeopardy protections never bar a subsequent criminal prosecution after a contempt proceeding for the same offense.  958 S.W.2d at 745 (citing Maples v. State, 565 S.W.2d 202 (Tenn. 1978); State v. Wyche, 914 S.W.2d 558 (Tenn. Crim. App. 1995); State v. Sammons, 656 S.W.2d 862 (Tenn. Crim. App. 1982)).

We do not think these cases, or Winningham's citation to them, prohibit us from applying the federal Double Jeopardy Clause in this case.  Maples and Sammons predate Dixon, and Wyche simply relies on those two cases without mentioning Dixon.  Winningham's citation to the three cases concerned the proper application of the federal test to determine the applicability of the Double Jeopardy Clause in cases involving contempt proceedings.  See id. at 743-46.  It did not cite them for a broad holding that double jeopardy never attaches to a contempt proceeding.  Nor did Winningham hold that the purpose or legislative intent behind contempt has any impact on the analysis used to determine the applicability of the federal double jeopardy protection.  In fact, after citing these three cases, Winningham proceeded to a straight-forward application of Chief Justice Rehnquist's test, which simply compares the statutory elements of each offense.  See id. at 745-46 (comparing the elements of Tennessee Code Annotated section 29-9-102(3) (contempt) with Tennessee Code Annotated section 39-14-301(a) (arson)).

### 1. Proper <u>Blockburger</u> analysis

The <u>Blockburger</u> test "inquires whether each offense contains an element not contained in the other." <u>Dixon</u>, 509 U.S. at 696. If each does not contain at least one element that is absent from the other, then "they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." <u>Id.</u>; <u>see also</u> <u>Winningham</u>, 958 S.W.2d at 743.

The proper application of the <u>Blockburger</u> test in the contempt context was a point of contention among the justices in <u>Dixon</u>. Justice Scalia, who wrote the Court's opinion but could not garner a majority for his test, concluded that where the contempt conviction is based on criminal conduct that violates an order prohibiting criminal acts, the elements of the underlying crimes are incorporated into the elements of contempt. <u>See</u> <u>Dixon</u>, 509 U.S. at 697-98. In <u>Dixon</u>, for example, an order prohibited one of the defendants from committing "any criminal offense." <u>Id.</u> at 691. The defendant was subsequently arrested for possessing cocaine. <u>Id.</u> Under Justice Scalia's approach, because the prosecution would have to prove the possession offense in order to demonstrate a violation of the order, the elements of cocaine possession were incorporated into the elements of contempt. <u>Id.</u> at 698. "[T]he 'crime' of violating [the order] cannot be abstracted from the 'element' of the violated condition." <u>Id.</u> In other words, the court looks beyond bare elements of nonsummary contempt—usually just the existence of an order and conduct that violates it—to examine what must be *proven* by the prosecution.

Chief Justice Rehnquist disagreed. He reasoned that <u>Blockburger</u> "focuse[s] on the statutory elements of the offenses charged, not on the facts that must be proved under the particular indictment at issue." <u>Id.</u> at 716-17 (Rehnquist, C.J., concurring in part and dissenting in part). Rather than incorporate elements from other statutes, he simply compared the statutory elements of contempt and the indicted offense. <u>Id.</u>

Our supreme court has adopted Chief Justice Rehnquist's approach, finding it "better-reasoned and more easily adaptable to Tennessee case law." <u>Winningham</u>, 958 S.W.2d at 745. We therefore apply the Chief Justice's framework to our analysis here.[4]

### 2. Application of <u>Blockburger</u> to indirect criminal contempt and custodial interference

---

[4] We note, however, that our conclusion would be the same under either approach because of the differing means rea requirements for each statute.

Comparing the elements of contempt and custodial interference reveals that they are not the same offense under Blockburger. The relevant elements of contempt are (1) willfully disobeying or resisting (2) a lawful order of a court. Tenn. Code Ann. § 29-9-102(3); see also Konvalinka v. Chattanooga-Hamilton County Hosp. Auth., 249 S.W.3d 346, 354-55 (Tenn. 2008) (listing "four essential elements" of contempt: (1) a lawful order; (2) that is "clear, specific, and unambiguous"; (3) a party that "actually disobeyed or otherwise resisted the order"; and (4) that violation must be willful). The relevant elements of custodial interference are: (1) a parent "of a child younger than eighteen (18) years of age"; (2) removing the child from Tennessee; (3) "*knowing that the removal violates a child custody determination . . . or a temporary or permanent judgment or court order regarding the custody or care of the child*." Tenn. Code Ann. § 39-13-306(a)(1) (emphasis added).[5]

Plainly, custodial interference requires elements not contained in contempt. Our analysis is complicated, however, by the fact that custodial interference *requires* the violation of a custody determination or order. Thus, custodial interference significantly overlaps with the contempt statute. Because Blockburger requires that *both* statutes contain elements that the other does not, see Dixon, 509 U.S. at 696; see also Winningham, 958 S.W.2d at 743, Appellant's custodial interference prosecution can withstand federal double jeopardy scrutiny *only* if there are instances of custodial interference that would not satisfy all of the elements of contempt. It does not matter if the juvenile court's order prohibits removal from the county and the custodial interference statute prohibits removal from the state because Appellant must violate the order to commit custodial interference. In other words, Appellant could violate the juvenile court order (by removing the child from the county) without committing custodial interference (by not removing the child from the state); but she could not commit custodial interference (by removing the child from the state) without violating the juvenile court order. There are two reasons for this outcome: first, leaving the state necessarily means leaving the county; second and more important, custodial interference requires the violation of an order as an element of the offense.

Yet, despite the significant overlap between the two statutes, a close comparison of the elements reveals that not every instance of custodial interference *necessarily* satisfies all of the elements of contempt. The two statutes use different words to describe their respective scienter requirements. Custodial interference requires "knowing" conduct; whereas contempt

---

    [5] Alternatively, the elements of custodial interference at issue here could be that (1) the parent of a child under 18; (2) "remove[s] the child from this state"; (3) after a period of lawful visitation ; (4) "*with the intent to violate . . . a temporary or permanent judgment or a court order regarding the custody or care of the child.*" Id. at (a)(2) (emphasis added). The parties cite Tennessee Code Annotated section 39-13-306(a)(1) as the pertinent subsection, and the indictment references "knowing" conduct, indicating that it is initiating an (a)(1) prosecution. We therefore analyze the case under that subsection.

requires a "willful" violation of a court order. Although this appears to make the Blockburger test straight-forward—custodial interference clearly has elements not required of contempt and contempt requires the higher "willful" mens rea—the cases defining "willfulness" demonstrate that the issue is not so simple. Indeed, we are aware of no controlling precedent defining willfulness as that term is used in a criminal contempt proceeding under Tennessee Code Annotated Section 29-9-102(3). But see In the Matter of Sydney T.C.H., No. M2009-01230-COA-R3-JV, 2010 WL 1254349, at *6 (Tenn. Ct. App., Mar. 31, 2010); O'Rourke v. O'Rourke, No. M2007-02485-COA-R3-CV, 2009 WL 1579244, at *4 (Tenn. Ct. App., June 5, 2009); id. at *7 (Kirby, J. dissenting).

Our supreme court has recently undertaken two thorough analyses of the meaning of the word "willful." See State v. Casper, 297 S.W.3d 676, 687-95 (Tenn. 2009) (defining willfulness in a securities statute); Konvalinka, 249 S.W.3d at 356-57 (defining willfulness in civil contempt). Both cases explain that willfulness is an ambiguous term that depends heavily upon the context in which it is used. "The word 'wilfully' has been characterized as a word of many meanings whose construction depends on the context in which it appears." Konvalinka, 249 S.W.3d at 357; see also Casper, 297 S.W.3d at 688. "Most obviously, it differentiates between deliberate and unintended conduct." Konvalinka, 249 S.W.3d at 357. Yet, the word can also denote an action that is "the product of free will rather than coercion." Id. (quoting State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group Trust, 209 S.W.3d 602, 612 (Tenn. Ct. App. 2006)) (quotation marks omitted). Moreover, it can mean "a thing done without ground for believing it is lawful; or conduct marked by careless disregard whether or not one has the right so to act," Casper, 297 S.W.3d at 688 (quoting Bryan v. United States, 524 U.S. 184, 191 n.12 (1998)); or an act "undertaken for a bad purpose," Konvalinka, 249 S.W.3d at 357. In short, "context is essential to determining the statutory meaning of the words 'willful' or 'willfully.'" Casper, 297 S.W.3d at 689.

Because it focuses on willfulness in the context of the contempt statute, Konvalinka is particularly instructive. There, the court noted the broad spectrum of meanings assigned to the word, and that, "in criminal law, 'willfully' connotes a culpable state of mind. In the criminal context, a willful act is one undertaken for a bad purpose." 249 S.W.3d at 357 (quotation marks omitted). However, Konvalinka concerned a *civil* contempt order, and "[i]n the context of a civil contempt proceeding . . . acting willfully does not require the same standard of culpability that is required in the criminal context." Id. (citing Flowers, 209 S.W.3d at 612). Consequently, the court concluded that willfulness in a civil contempt proceeding

consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free

-8-

agent, knows what he or she is doing, and intends to do what he or she is doing. Thus, acting contrary to a known duty may constitute willfulness for the purpose of a civil contempt proceeding.

Id. (quotation marks and citation omitted). In other words, knowing, volitional conduct in violation of a court order is tantamount to "willful disobedience" for the purposes of civil contempt.

We read the supreme court's articulation of the varying standards for willfulness in Konvalinka, and its express limitation of the "intentional or voluntary" standard to *civil* contempt proceedings, to indicate that something more is required for willfulness in the context of a criminal contempt proceeding. Although the court did not specifically state that the standard for willfulness in a criminal contempt proceeding is "a culpable state of mind" equivalent to "a bad purpose," it used those standards to distinguish between willfulness "[i]n the criminal context" and the standard it adopted for civil contempt. Id. We therefore conclude that in order for a party's disobedience of a court order to be "willful" and subject to criminal contempt under section 29-9-102(3), the act must be "done voluntarily and intentionally and with the specific intent to do something the law forbids." See id. (quoting State v. Braden, 867 S.W.2d 750, 761 (Tenn. Crim. App. 1993)). In other words, the contemnor's act must be "undertaken for a bad purpose." Id. (quoting Bryan, 524 U.S. at 191); see also T.C.H., No. M2009-01230-COA-R3-JV, 2010 WL 1254349, at *6 ("'Willful' means that the violation of the court's order was committed intentionally, with knowledge that the act was in violation of the court[']s order, as distinguished from an accidental, inadvertent or negligent violation of an order. In other words, it must be shown that the defendant intentionally and deliberately disobeyed the court order.") (quotation marks, citations, and brackets omitted).

This heightened mens rea contrasts with the scienter requirement for custodial interference. As noted above, "knowing" conduct satisfies the scienter requirement of Tennessee Code Annotated section 39-13-306(a)(1). While the knowing mens rea may be equivalent to the standard of "willfulness" for a civil contempt proceeding articulated by Konvalinka, it is not equivalent to the heightened standard necessary for a criminal contempt proceeding. Furthermore, although the thing that is "known" in an (a)(1) violation is the legality of the conduct vis-a-vis a custody order—"knowing that [the conduct] violates [the order]"—we conclude that the standard does not rise to the level of voluntary and intentional conduct necessary for criminal contempt. Indeed, the legislature indicated as much by inserting an intentionality requirement in (a)(2). See Tenn. Code Ann. § 39-13-306(a)(2) (criminalizing the detention of a child within the state or removal of a child from the state after a period of lawful visitation "with the intent to violate" a custody order). "Where the legislature includes particular language in one section of the statute but omits it in another

section of the same act, it is presumed that the legislature acted purposefully in including or excluding that particular subject." Casper, 297 S.W.3d at 693 (quoting State v. Hawk, 170 S.W.3d 547, 551 (Tenn. 2005)) (brackets omitted).

Because criminal contempt requires greater culpability than custodial interference, we conclude that the present prosecution passes the Blockburger test. There are several elements necessary for custodial interference that are not required of contempt. As we have explained, criminal contempt requires a higher mens rea than is necessary for custodial interference under subsection (a)(1). In other words, there are situations in which even though the conduct violates (a)(1), the defendant may not have had the culpability necessary to rise to the level of criminal contempt. Consequently, both statutes contain elements not present in the other. The present prosecution, therefore, does not violate the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.

## B. Examination Of Proof

The second step in the Denton analysis, the comparison of the evidence relied upon for conviction in the case, weighs in favor of finding a double jeopardy violation. Given the similarities in the two statutes described above, it is not surprising that the same evidence was used to convict in both prosecutions. In fact, it does not appear from the record that there was any dispute that Appellant was aware of the limitations imposed by the Juvenile Court's order or that Appellant knowingly and voluntarily removed the child from the state. As a result, the evidence in this case did not highlight the slight variations in the two statutes, such as the differing mens rea requirements or the arguably different jurisdictional limits. We therefore conclude that this factor weighs in favor of finding that the present prosecution is for the same offense as Appellant's criminal contempt conviction, and, consequently, infringes upon Appellant's state double jeopardy protection.

## C. Comparison Of Acts And Victims

The third step in the Denton analysis, determining whether the charges show multiple episodes of criminal conduct or multiple victims in a single episode of criminal conduct, is neutral. As alluded to above, both prosecutions concern a single course of conduct. However, even though Appellant engaged in only a single course of conduct, the two prosecutions involved distinct victims. "In general terms, criminal conduct offends the State as the sovereign." Winningham, 958 S.W.2d at 746. Appellant's custodial interference could also offend Mr. Ash, the parent whose rightful custody was infringed upon by Appellant's actions. Accord id. "In contrast, the proceeding in contempt is for an offense *against the court as an organ of public justice*, and not for violation of the criminal law." Id. (quotation marks and brackets omitted) (quoting Sammons, 656 S.W.2d at 868). We thus

-10-

conclude that Appellant's two prosecutions involved a single episode of criminal conduct, but multiple victims. This factor is therefore neutral in our state double jeopardy analysis.

## D. Purposes Of Statutes

The final step in the <u>Denton</u> analysis is to determine whether the statutes serve different purposes. This factor weighs strongly in favor of finding that the present prosecution does not violate Appellant's state double jeopardy protections. As our supreme court explained in <u>Maples</u>:

> The purposes of the general statutes authorizing a court to punish for abuse of its processes and those creating and prescribing punishment for various indictable offenses *are so entirely different, and designed to accomplish such wholly different purposes*, that we do not find any violation of constitutional principles in imposing punishment upon an offender under both sets of statutes.

<u>Sammons</u>, 656 S.W.2d at 866-67 (quoting <u>Maples</u>, 565 S.W.2d at 203) (emphasis added). Undoubtedly, the prohibition against removing a child that is the subject of a custody determination is intended to protect the child as well as the rights of the rightful guardian. The State further explained at oral argument that the statute was intended, in part, to facilitate the swift repatriation of a removed child. While these goals may seem similar to the goals of the contempt statute in this particular case, that perception is misleading. The contempt statute—which applies in a wide variety of contexts, not just in those concerning custody determinations—addresses *institutional* concerns. "[T]he offense of contempt of court has as its purposes the maintenance of the integrity of court orders and the vindication of the court's authority." <u>Winningham</u>, 958 S.W.2d at 746 (citing <u>Dixon</u>, 509 U.S. at 742 (Blackmun, J., concurring and dissenting); <u>Sammons</u>, 656 S.W.2d at 869); <u>see also</u> <u>Wyche</u>, 914 S.W.2d at 561. Indeed, "[s]o essential is this purpose to the proper functioning of the court that even erroneous orders must be obeyed." <u>Winningham</u>, 958 S.W.2d at 746-47. Thus, the two statutes serve very different purposes: one to protect society; the other to protect the courts. We therefore conclude that this factor weighs heavily in favor of finding no violation of Appellant's state double jeopardy protections.

## E. Balance Of <u>Denton</u> Factors

Having proceeded through the <u>Denton</u> framework, we conclude that, on the record before us, Appellant's convictions for criminal contempt and custodial interference do not violate the state protections against double jeopardy. Although the prosecutions utilized the same proof and addressed a single course of conduct, both statutes authorizing the

prosecutions required different elements, concerned different victims, and served vastly different purposes. As our supreme court has noted, "whether the same conduct can be subjected to multiple punishment is a matter of legislative intent." <u>Winningham</u>, 958 S.W.2d at 745. Although we believe this is a closer case than <u>Winningham</u>, which concerned prosecutions for contempt and arson, we similarly conclude that "the legislature clearly intended that the [custodial interference] statute and the contempt statute address totally separate and independent concerns." <u>Id.</u> Consequently, Appellant has not been impermissibly subjected to multiple punishments for the same offense, <u>see</u> <u>Denton</u>, 938 S.W.2d at 381, and the trial court did not err in denying Appellant's motion to dismiss.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE